# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 04-619 |
| PRESTON LIT | : | |

GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Nancy Beam Winter, Assistant United States Attorney, respectfully submits the following trial memorandum.

I. Introduction.

The federal grand jury returned a one-count indictment charging the defendant with two subsections of the same statute, subsection (a)(2) and subsection (a)(3) of 2332a. Count One charges that on or about February 18, 2004, at Philadelphia, Pennsylvania, defendant Preston Lit, without lawful authority,[1] threatened to use a weapon of mass destruction, that is, a destructive device, specifically a package which purported to be an explosive bomb, against persons in the Philadelphia International Airport, and such threat would have affected interstate or foreign commerce, and also against property, that is, the Philadelphia International Airport, that is used by departments and agencies of the United States, that is, the Transportation Security Administration, Immigration and Customs Enforcement, and Customs and Border Protection.

---

[1] "Without lawful authority" is a affirmative defense that must be raised by the defendant. United States v. Wise, 221 F.3d 140, 148-50 (5th Cir. 2000).

II. Elements of offense charged

In order to sustain its burden of proof as to subsection (a)(2) of 2332a, the government must prove the following essential elements beyond a reasonable doubt:

<u>One</u>: The defendant threatened to use a weapon of mass destruction;

<u>Two</u>: That the threat of the weapon of mass destruction was directed against a person within the United States; and

<u>Three</u>: That the result of such affected interstate commerce, or in the case of a threat, would have affected interstate commerce.

In order to sustain its burden of proof as to subsection (a)(3) of 2332a, the government must prove the following essential elements beyond a reasonable doubt:

<u>One</u>: The defendant threatened to use a weapon of mass destruction;

<u>Two</u>: That the threat of the weapon of mass destruction was directed against any property that is owned, leased or used by the United States or by any department or agency of the United States.

III. Facts

On Wednesday, February 18, 2004, a citizen discovered a suspicious package believed to be a possible bomb in the men's bathroom handicap stall in the baggage arrivals area of Terminal B of the Philadelphia International Airport at approximately 12:15 p.m. Terminal B is the terminal that services multiple airlines involved in interstate and foreign commerce. The airport location is also used by departments and agencies of the United States, that is, the Transportation Security Administration, Immigration and Customs Enforcement, and Customs

and Border Protection. The citizen notified a police officer that he saw a suspicious package in the bathroom, and officers secured the area. Based on the threat of a possible bomb or destructive device, the area was cordoned off, a down escalator was turned off, and arriving passengers were diverted to another area of the baggage claims area.

Upon examination of the package, officers observed writing on the outside of the white cardboard shoebox and two notes attached to the box. White nylon cord was wrapped around the box and two pairs of blue and yellow handled pliers were attached to the box with the nylon cord. There were also three nails visible that were embedded into the top of the box. Written on the outside of the box in red and blue ink were the words, "Al Quada Airport Device, (an incorrect spelling of the name; the correct spelling is Al Qaeda)." Written in pencil on the outside of the box were the words, "15 lbs C-4, 3 lbs TNT, 2 blast caps, 1 silent timer." Also drawn on the box in pencil was a clock face set at 7:00. Attached to the box was a note which read; "all U.S. airspace closed to commercial traffic from 2-20-04 noon, to 2-28-04 noon, only military aircraft may fly." The note was signed, "Preston." A second note, written on a National Parks Conservation Association mailer, was attached to the outside of the box. It was dated "14 Feb 2004" and read; "Dear George W., get the fuck out of Iraq now. Be all gone by April 15th at noon est. George Washington, Saddam Hussein, Jesus II."

Because the device appeared to be a bomb,[2] the Philadelphia Police Department Bomb Squad was notified and responded to the scene. Using a remote device, the package which was feared to be a bomb was x-rayed. The x-ray revealed what appeared to be a large battery,

---

[2] A bomb - or the threat of a bomb - is included in the definition of "weapon of mass destruction" for purposes of 18 U.S.C. § 2332a.

wires, nails and other dense objects. Based on the bomb squad members' experience and their interpretation of the x-ray, members of the bomb squad believed that there were no active explosives inside of the box. They elected to fire a gunpowder shell into the box in order to render it safe and detonate any materials that were inside the box in the contained area of the bathroom stall. When the gunpowder shell hit the package, it exploded, spraying nails, screws and shrapnel inside the bathroom stall. An examination of the remains of the package's contents revealed, in addition to the nails, screws, and shrapnel, a 9 volt Rite Aid battery and red wire. The notes and the recovered shrapnel were retained. The device contained no igniter or incendiary powder that could have caused an explosion.

This purported bomb is strikingly similar to another hoax bomb that was left by Preston Lit in a mailbox in northeast Philadelphia on May 13, 2002, to include an incorrect spelling of "Al Quada." Part of the bomb expert's analysis of the appropriate treatment of the airport device was also the expert's familiarity with Lit and his prior hoax bomb. The experts immediately recognized the similarity between this and the 2002 device, and their reaction to this device has context only within the larger parameters of their familiarity with the bombmaker.

The references to C4 and TNT on the package found 2-18-04 at the airport were repeated in a note posted by Lit on the front door of his house the same day the airport hoax bomb was found. The Philadelphia police responded to Lit's home after receiving a call from a nearby synagogue on whose lawn someone had strewn a variety of bizarre trash. (Because this neighborhood has long dealt with Lit, it was immediately suspected that he had strewn the trash about.) Police went to Lit's house, saw the note on his door, and called the FBI. In the note posted on Lit's door, in handwriting similar to that of the notes on the airport package, Lit invited

the FBI to wait for him to arrive back home, but not to go into the house, noting that there was C4 and TNT inside the house. The note read:

> FBI, 2-19-2004 No need to break down this door. Just guard this house till I get home, Then we'll talk over tea and biscuits. Only 3 invited in with I-D Jeff Lampinski[3] Ralph Saturno[4] Jim Crowley[5]  Love and Peace, Preston H. Lit aka Abraham Lincoln   250 lbs. of TNT  415 lbs. of C-4 50 GAL. of Reg. Unleaded "The Bottom Line"

In response to the call from Philadelphia police, FBI agents knocked at Lit's door and there was no answer. Agents contacted Lit's federal probation officer, who told them that Lit had not reported as required that week. After being advised of the note left on his door, the probation officer sought and obtained an arrest warrant for non-reporting from the district judge supervising Lit.

Because of the threat contained in the note, agents were concerned that the house may be rigged with explosives. Federal and state agents, officers, SWAT team members, and bomb squad members were called to respond to the block. The street was blocked off, and all near neighbors were evacuated from their homes. Surveillance was set up on the house, and, as the day progressed into evening, lights could be seen going on and off in two rooms, leading agents to conclude Lit may be inside.[6] An entry was finally made by the SWAT team near

---

[3]    Then Special Agent in Charge of the Philadelphia resident agency of the FBI.

[4]    Agency counsel for the Philadelphia resident agency of the FBI.

[5]    An FBI agent from the Philadelphia resident agency of the FBI who was involved in Lit's 2002 hoax bomb investigation.

[6]    On this day, press helicopters hovered over his house, the street was blocked off, and all near neighbors were evacuated from their homes. By now also, agents - and the press - had become aware of the device at the airport, and, because the note on the airport device was signed "Preston," the connection between the two events was made by agents and the press at about the

morning. Lit was not inside. The lights had been placed on timers. A search warrant was executed. There were no bombs inside.

Lit remained a fugitive for a period of five days. In a later reconstruction of his itinerary, agents determined that Lit made significant preparations for his crime spree. Between 2-4-04 and 2-6-04, Lit made six separate withdrawals of cash from his savings account totaling $38,000.

On Monday, February 16, 2004, at 8:58 p.m., just 36 hours before Lit left the device at the airport, Lit rented a white 2004 Buick LeSabre sedan, bearing Pennsylvania tag number FMF 6334, from Alamo Car Rental at Philadelphia International Airport. On Wednesday, February 18, 2004, at 6:43 a.m., the above-described vehicle was observed entering the short-term parking lot, section A-B, at Philadelphia International Airport. This parking lot provides parking service to Terminal B, the terminal in which the hoax bomb was found. At 6:58 a.m., the vehicle was seen leaving the short-term parking lot. This information was provided to agents by Philadelphia Parking Authority personnel, and the above-described events were captured on videotape recorded by cameras installed at the parking facility. The airport "bomb" was found a few hours later on the same day.

After leaving the device at the airport, Lit went to New Jersey and then to central Pennsylvania, staying in hotels and frequently using an alias. In New Jersey, he did damage to his hotel room, upending furniture and leaving notes written on the furniture and fixtures of the room. He left a device strikingly similar to the airport device in the hotel. It was a shoebox

---

same time. Thus, it was widely - and repeatedly - reported in the news that Preston Lit was a fugitive and was suspected of having left a device at the airport.

labeled "Al Quada hotel leveling device" with a clock drawn on its face. The cleaning lady who found the device feared that it was a bomb. Police were called. After the box was opened, it was found to contain various pieces of paper and odds and ends.

A day later, Lit traveled to central Pennsylvania, where he again destroyed a hotel room in Juniata County, leaving notes written on furniture and fixtures, this time overturning a lamp and leaning it against some towels so that the towels would catch on fire. The towels smoked for a significant period of time, finally causing fire alarms to go off around the midnight hour. Hotel personnel were able to get into the room, which was so filled with smoke that there was no visibility. They were able to disrupt the items in the room by pulling them all apart before the smoking towel caught fire. All residents on that floor of the hotel had to be evacuated.[7] The entire room was smoke damaged.

On Monday, February 23, 2004, at 6:11 a.m., the Lower Southampton Police Department [LSPD] received a complaint from a citizen who stated that she was an ex-girlfriend of Lit's and that his car was parked in front of her home. The ex-girlfriend was concerned that Lit was on her property. Police responded to the area, but Lit had already left the residence. While traveling westbound on Street Road near Bustleton Avenue, an LSPD Officer responding

---

[7] It is these events that are the subject of an arrest warrant for arson, risking a catastrophe, recklessly endangering another person, and related charges, from authorities in Juniata County. That warrant has been lodged as a detainer. The government does not seek introduction of these crimes occurring in Juniata County. However, should the defendant elect to testify, depending on his testimony, these incidences may become admissible or the subject of relevant cross-examination. Thus, they are mentioned so that this Court has a complete picture of the defendant's conduct both as it relates to charged and relevant and admissible conduct, but also as it relates to the defendant's conduct while a fugitive. Lit, who had registered under an alias in that hotel, took some items from the hotel room. These items were found in the trunk of his rental car after his arrest on 2-23-04 upon the execution of a federal search warrant.

to this call observed a newer white Buick traveling eastbound on Street Road. Minutes later, the officer observed the vehicle again outside of the Feasterville Post Office, and a white male was standing outside of the vehicle. When the vehicle continued eastbound on Street Road, the officer observed a blue Pennsylvania registration, CAJ7163, in a Colonial Nissan frame. This type of registration was known to the officer as having been discontinued by the State of Pennsylvania. Further, a check of that the registration number showed that it belonged not on the white Buick driven by Lit but on a Nissan vehicle.

The officer stopped the vehicle on Central near Vista Street. The driver identified himself as Preston Lit. The officer knew Lit was wanted, and Lit was taken into custody. Because of Lit's history and threats to use explosives, the Philadelphia Police Department Bomb Squad responded to inspect the vehicle. Located inside of the vehicle was Pennsylvania registration FMF 6334, the license plate that should have been on the vehicle and which had clearly been replaced by Lit with the other older out-of-date license plate.

On Monday, February 23, 2004, the same day that Lit was arrested by the Lower Southampton Police Department, numerous receipts were recovered from the parking lot of the New Eden Fellowship located in Schwenksville, Pennsylvania by the Borough of Schwenksville Police Department. Among the items recovered was a Philadelphia International Airport parking receipt dated February 18, 2004. The receipt listed a vehicle bearing Pennsylvania registration FMF 6334 entered the parking lot at 6:43 a.m on February 18, 2004 and exited at 6:58 a.m. that same date.

IV. Potential Trial Issues

    1. Expert Testimony

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

Fed. R. Evid. 702. The government will submit a bomb expert who will testify as both a fact witness, having responded to both Lit's May 2002 hoax bomb in the mailbox and to the February 2004 bomb, but also as an expert on bomb composition and impact. Bomb composition and impact are areas where the jury will be assisted in their understanding of the evidence.

The bomb expert[8] will testify as to the required components of a bomb, what facts are evaluated when assessing a suspicious device, the safety steps necessary, the methods necessary to detonate a suspicious devices, the impact of detonation of both hoax and real bombs, and the risks involved with both.

    2. 404(b) Motion

The government has filed under separate cover its motion and it response to defendant's motion.

    3. Stipulations

The defendant has agreed to stipulate as to identity, that is, that he is person who constructed and placed the device purporting to be a bomb at the Philadelphia airport.

---

[8] Whose curriculae vitae has been provided to the defendant prior to trial, along with an invitation to interview in advance of trial if defense counsel wishes.

VI. Other issues

Obviously, potential rebuttal witnesses exist, whose presentation would depend on whether the defendant elects to present any defense, whether the defendant testifies, and if he does, what he or other witnesses say in the course of that defense.

The government will provide a list of pre-marked trial exhibits along with photocopies of any documentary exhibits.

Jury instructions and voir dire have been filed under separate cover.

VII. Estimate of Trial

The presentation of the government's case should take between five and six days. This time estimate may be significantly affected by those matters not in dispute and for which the parties may be able to fashion additional stipulations, such as the defendant's bank records, verifying the defendant's presence and use of an alias at hotels (without necessitating the evidence relating to the status and circumstances of his stay), auto rental records, and the like

The parties will advise the court in advance if they have been able to arrive at any stipulations which would expedite the trial.

                                              Respectfully submitted,

                                              PATRICK L. MEEHAN
                                            United States Attorney

                                            _____

                                            DAVID B. WEBB
                                            Assistant United States Attorney
                                            Section Chief

                                            _____

                                            NANCY BEAM WINTER
                                            Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Trial Memorandum was sent on this date by first class mail to:

        Robert Donatoni, Esq.
        17 West Gay Street - Suite 102
        West Chester, PA 19380-3090

        NANCY BEAM WINTER
        Assistant United States Attorney

Date: _____